1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT
9                        FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11   LAL DEV,                                    No.  2:12-cv-3026-JAM-EFB PS
12                    Plaintiff,
13        v.                                      ORDER AND FINDINGS AND
                                                  RECOMMENDATIONS
14   PATRICK R. DONAHOE,
     POSTMASTER GENERAL OF THE
15   UNITED STATES POSTAL SERVICE,
     DOES 1-15 INCLUSIVE,
16
                     Defendant.
17

18
19          This matter was before the court on March 5, 2014, for hearing on defendant's motion for
20   summary judgment.[1]  Assistant U.S. Attorney Edward A. Olsen appeared on behalf of the
21   defendant; plaintiff Lal Dev appeared pro se.  After careful consideration of the moving and
22   opposing papers and the oral arguments, it is recommended that defendant's motion be granted.

23   I.      Procedural Background
24          Plaintiff, Dev, a postal employee, filed this action against Patrick R. Donahoe, Postmaster
25   General of the United States, pursuant to Title VII of the Civil Rights Act of 1964.  Compl., ECF
26   No. 1.  Dev alleges that he was subjected to discrimination on account of his race, color, and sex,

27   ────────────────────
28        [1]  This action proceeds before the undersigned pursuant to Eastern District of California
     Local Rule 302(c)(21) and 28 U.S.C. § 636(b)(1).

                                                   1

1    and to retaliation, when his rural route was adjusted on March 24, 2012, which resulted in his

2    annual salary being reduced.  *Id.* ¶ 40.

3         The Postmaster has moved for summary judgment, arguing that Dev cannot establish a

4    *prima facie* case of either disparate treatment or retaliation, and even if he could he cannot show

5    that the Postmaster's articulated legitimate reasons for the purported adverse action are pretextual.

6    Def.'s Mot. for Summ. J., ECF No. 27.  In violation of Local Rule 230, Dev failed to timely file

7    an opposition to the motion.[2]  Accordingly, Dev was ordered to show cause why sanctions should

8    not be imposed.  ECF No. 31.  His response asserted that the failure to file an opposition was

9    inadvertent.  Ultimately, the order to show cause was discharged without imposition of sanctions

10   and Dev was granted additional time to submit an opposition.  That opposition has since been

11   filed and has been considered.  ECF Nos. 34, 36, 37.  Additionally, as discussed below, the court

12   ordered supplemental briefing and declarations have been filed and considered.

13   II.    Facts

14          A.    Rural Letter Carriers

15          Plaintiff, Dev, is employed by the United States Postal Service as a rural letter carrier at

16   the Rocklin Post Office.  Decl. of Cheri Smith ("Smith Decl."), ECF No. 27-3, ¶ 10.  He is a

17   native of India and his race is Asian Indian.  Compl. ¶ 21.  Rural letter carriers are unionized

18   under the National Rural Letter Carriers' Association ("Association"), which has a collective

19   bargaining agreement ("Agreement") with the Postal Service.  ECF No. 27-3 ¶ 9; Decl. of Sandra

20   Schmidt, ECF No. 27-2, ¶ 5.  There are 17 regular rural routes at the Rocklin Post Office.  ECF

21   No. 27-3 ¶ 6.  The Postmaster at the Rocklin Post Office is Cheri Smith, a Caucasian, white,

22   female.  *Id.* ¶¶ 1, 5.

23          Much of the instant dispute concerns the classification or evaluation of plaintiff's mail

24   route which resulted in a pay reduction.  The United States Postal Service does not compensate its

---

26   [2] Instead, plaintiff responded with a request to stay this case pending resolution of his
27   other case against the Postmaster, *Dev v. Donahoe*, 2:11-cv-2950-JAM-EFB ("*Dev 1*").  ECF No.
     29 at 1-2.  Judgment has since been entered in that action granting the Postmaster's motion for
     summary judgment.  *Dev 1*, ECF No. 139.  The request for a stay of the instant case was denied.
28   ECF Nos. 30 and 35.

1   rural carries on an hourly basis.  Instead, rural carries are paid a salary based on an Evaluated

2   Compensation System provided in the Agreement.  Second Supplemental Declaration of Sandra

3   Schmidt ("2nd Supp. Schmidt Decl."), ECF No. 44 ¶ 7.[3]  To determine a rural carrier's annual

4   salary, the Postal Service first calculates the "standard hours and minutes" for each rural carrier's

5   route, which is determined by three elements: (1) the length of the route, (2) the number of mail

6   boxes, and (3) the weekly average of mail delivered.  *Id.* ¶¶ 8-9.  The standard hours and minutes

7   is the amount of time it should take a carrier to complete the route.  *Id.* ¶ 8.  Each route's standard

8   hours and minutes are reviewed at least annually and can change from year to year.  *Id.* ¶ 10.

9       After the standard hours and minutes for a route are assessed, the Postal Service then

10  determines the number of "evaluated hours" for each rural carrier's route.  *Id.* ¶ 11.  The number

11  of evaluated hours can range from 40 to 48 hours.  *Id.* ¶ 12.  A rural carrier is given a fixed salary

12  based on the number of evaluated hours for his or her route, with step increases depending on

13  years of service with the Postal Service.  *Id.*  Generally, under this system the higher the

14  evaluated hours, the higher the carrier's salary will be.  *Id.*

15      The number of evaluated hours for a route is determined by (1) the number of standard

16  hours and minutes for the route, and (2) whether the route is classified as a "H" route, a "J" route,

17  or a "K" route.  *Id.* ¶ 13.  But the classification of the route also determines the number of work

18  days in a pay period which also affects salary.  Significantly here, an H route requires a carrier to

19  work all 12 days during a pay period with no days off.[4]  *Id.* ¶ 14.  A J Route is one in which the

20  carrier works 11 days in the pay period and receives a day off (in addition to the Sundays which

21  carriers do not work).  *Id.*  A K route is one in which the carrier works 10 days in the pay period

22  and receives two days off (in addition to Sundays).  *Id.*

23      To determine the evaluated hours for a route, the Postal Service uses the Table of

24  Evaluated Hours for Rural Carriers ("Table") set forth in the Agreement.  *Id.* ¶ 15; *see also* ECF

25      [3] At the request of the court, the parties submitted supplemental briefs addressing the
26  Postal Service's Evaluated Compensation System and how plaintiff's route was reclassified under
    this system.  ECF Nos. 43, 47, 48

27      [4] There are 12 working days in a pay period, and carriers do not work on Sundays.
28  Schmidt Decl., ECF No. 27-2 ¶ 10.

No. 27-2 at 11.  The table contains two columns; the left column lists various standard hours and minutes, and the right column contains the corresponding evaluated hours for the standard hours and minutes.  ECF No. 44 at 3-4, ¶ 15.  Thus, to determine a route's evaluated hours, the Postal Service first assesses the route's standard hours and minutes, then locates the standard hours and minutes in the left column, and finally scrolls across to the right column to find the evaluated hours for the route.  *Id.* at 4, ¶¶ 16, 17.  Depending on the total standard hours and minutes, the route will be classified as an H, K, or J route.  *Id.* ¶ 15.  For example, if the standard number of minutes for a route is assessed at 53:24, the route is classified as a K route, with the corresponding number of evaluated hours at 45.  *Id.* ¶ 15, 18.  This route would be classified as a K45 route, meaning the carrier works 10 days a pay period and has 2 relief days, and the carrier's salary is based on 45 evaluated hours.  *Id.* ¶ 18.  In contrast, an H route has no relief days and the carriers on such routes work every day but Sundays.  *Id.* ¶ 15.

To further complicate things, under the Table the standard hours and minutes for a route sometimes falls into two possible classifications and, accordingly, two different evaluated hours categories.  *Id.* ¶ 20.  These are referred to as the high and low election in the Agreement.  *Id.*  For example, if the route's standard hours and minutes are assessed at 46:22, the route falls into two possible classifications, a J (one relief day) route and an H (no relief days) route.  *Id.* ¶ 21.  If the carrier elects the low option, the route will be classified as 43J route, which will result in the carrier working 11 days during a pay period and being paid a salary based on 43 evaluated hours.  *Id.*  If the carrier elects the high option, the route is classified as a 46H route, meaning the carrier works 12 days during a pay period and the salary is based on 46 evaluated hours.  *Id.*  Thus, when a route falls into two possible classifications, the carrier has the option to work fewer day(s) with less pay, or work more day(s) with more pay.  *Id.* ¶ 22.  In the experience of the District Rural Coordinator, the majority of rural carriers prefer a K route (two relief days off) over an H (no relief days off) or J (one relief day off) route.  *Id.* ¶ 24.

/////

/////

/////

4

B.     Plaintiff's Route

Plaintiff was selected as the carrier for Rural Route 8 on March 13, 2010.  ECF No. 27-3 at 5 (Smith Decl. ¶ 13).[5]  At that time Rural Route 8 was classified as a 40K route, meaning that it was evaluated at 40 weekly hours with 2 relief days (10 workdays) during the pay period.  ECF No. 27-2 at 5, ¶ 27.  Following the 2010 National Count, Rural Route 8 was classified as a 41J route, meaning that it was evaluated at 41 hours with 1 relief day (11 workdays) per pay period.  *Id.* ¶ 28.  However, because the standard hours and minutes for the route fell into two classifications—J route and H route—plaintiff was able to elect the high option.  *Id.* ¶¶ 15, 28.  As a result of plaintiff's high option election, the route was classified as a 45H route, meaning that it was evaluated at 45 hours with no relief days (12 workdays) during the pay period.  *Id.* ¶ 29.  Plaintiff's yearly salary was set at $59,973.  *Id.*

Following the 2011 National Count, Route 8's standard hours and minutes was assessed at 45:32.  ECF No. 27-3 at 5, ¶ 26; ECF No. 27-2 at 5, ¶ 30.  Under the Table, this number of standard hours and minutes corresponded with two possible classifications, a 42J route and a 46H route.  ECF No. 44 at 6, ¶ 27.  Plaintiff elected the high option of a 46H route, meaning that his salary was based on 46 evaluated hours and he had no days off per pay period.  *Id.* ¶ 28.

On March 24, 2012, the Rocklin Postmaster adjusted several rural routes due to two events: (1) Rural Route 16, which was vacant, was available for distribution of its territory to existing routes, and (2) territory from a highway contract route that had previously been assigned to a contractor became available to create one full-time route, Rural Route 21, and one auxiliary route, Rural Route 22.  ECF No. 27-2 at 4, ¶ 17.  Prior to the March 2012 adjustments, the Postmaster announced to carriers that if they wanted additional territory they must submit a written request for it and in response plaintiff informed the postmaster in writing that he wanted territory from Routes 16 and 20 added to his route.  ECF No. 44 at 6, ¶ 30; Dev Dep. at 39.

As a result of the March 2012 adjustments, plaintiff's route gained additional territory worth 6:36 weekly standard hours and minutes, for a total of 52:08 standard hours and minutes.

---

[5]  Plaintiff claims that he began working as the carrier for Rural Route 8 on February 27, 2010.  RSUF 39.  The starting date is not material.

5

1   Schmidt Decl. ¶ 33-35.  Under the Table, 52:08 standard hours and minutes falls only into one

2   category, a K route with 43 assessed hours.  ECF No. 44 at 7, ¶ 35.  Because Route 8's evaluated

3   hours dropped from 46 to 43, plaintiff's salary was reduced by $5,808.  *Id.* ¶ 36.[6]  However, the

4   change from an H route to a K route resulted in plaintiff gaining 2 days off per pay period.  *Id.*

5   III.   Plaintiff's Motion to Strike the Declaration of Sandra Schmidt

6           Dev requests in his supplemental brief that the court strike the supplemental declaration of

7   Sandra Schmidt, an Operations Program Support Specialist and District Rural Coordinator.[7]

8   ECF No. 47 at 2-7.  Dev contends that the declaration contains statements that are either false or

9   inconsistent with other evidence.  In essence, he disputes the veracity of Ms. Schmidt's

10  statements rather than the foundation for her testimony, which is not a basis for striking the

11  declaration.  Ms. Schmidt's declarations have an adequate foundation for her personal knowledge

12  of the facts stated therein and her testimony addresses relevant facts.  Plaintiff's disagreement

13  with the truth of Schmidt's statements does not render her testimony inadmissible for purposes of

14  summary judgment.  Accordingly, plaintiff's motion to strike Schmidt's first supplemental

15  declaration is denied.

16  IV.   Motion for Summary Judgment

17          A.   Standard

18          Summary judgment is appropriate when there is "no genuine dispute as to any material

19  fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary

20  judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant

21  to the determination of the issues in the case, or in which there is insufficient evidence for a jury

22

23          [6]  In her supplemental declaration, Sandra Schmidt states that plaintiff's salary was
    reduced by $5,333.  2nd Supp. Schmidt Decl. ¶ 36.  Plaintiff argues that his salary was reduced
24  by $5,808.  ECF No. 37 at 5.  In the supplemental reply brief, defendant concedes that plaintiff's
    salary was reduced by $5,808.
25

26          [7]  Plaintiff only moves to strike the first supplemental declaration of Sandra Schmidt even
    though Ms. Schmidt has submitted three separate declarations, each containing substantial
27  overlap in testimony.  *See* ECF Nos. 27-2, 39-2, 44.  Schmidt's latest, supplemental declaration
    was submitted in response to the court's order for further briefing and explanation of the
28  methodology for route classification and salary determinations.

1   to determine those facts in favor of the nonmovant.  *Crawford–El v. Britton*, 523 U.S. 574, 600

2   (1998); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50 (1986); *Nw. Motorcycle Ass'n v.*

3   *U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994).  At bottom, a summary judgment

4   motion asks whether the evidence presents a sufficient disagreement to require submission to a

5   jury.

6          The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims

7   or defenses.  *Celotex Cop. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Thus, the rule functions to

8   "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

9   trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

10  (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).  Procedurally,

11  under summary judgment practice, the moving party bears the initial responsibility of presenting

12  the basis for its motion and identifying those portions of the record, together with affidavits, if

13  any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477

14  U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  If the moving

15  party meets its burden with a properly supported motion, the burden then shifts to the opposing

16  party to present specific facts that show there is a genuine issue for trial.  Fed. R. Civ. P. 56(e);

17  *Anderson*, 477 U.S. at 248; *Auvil v. CBS "60 Minutes"*, 67 F.3d 816, 819 (9th Cir. 1995).

18         A clear focus on where the burden of proof lies as to the factual issue in question is crucial

19  to summary judgment procedures.  Depending on which party bears that burden, the party seeking

20  summary judgment does not necessarily need to submit any evidence of its own.  When the

21  opposing party would have the burden of proof on a dispositive issue at trial, the moving party

22  need not produce evidence which negates the opponent's claim.  *See e.g., Lujan v. National*

23  *Wildlife Fed'n*, 497 U.S. 871, 885 (1990).  Rather, the moving party need only point to matters

24  which demonstrate the absence of a genuine material factual issue.  *See Celotex*, 477 U .S. at

25  323–24 ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

26  issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings,

27  depositions, answers to interrogatories, and admissions on file.'").  Indeed, summary judgment

28  should be entered, after adequate time for discovery and upon motion, against a party who fails to

7

1   make a showing sufficient to establish the existence of an element essential to that party's case,

2   and on which that party will bear the burden of proof at trial.  *See id*. at 322.  In such a

3   circumstance, summary judgment must be granted, "so long as whatever is before the district

4   court demonstrates that the standard for entry of summary judgment . . . is satisfied."  *Id*. at 323.

5          To defeat summary judgment the opposing party must establish a genuine dispute as to a

6   material issue of fact.  This entails two requirements.  First, the dispute must be over a fact(s) that

7   is material, i.e., one that makes a difference in the outcome of the case.  *Anderson*, 477 U.S. at

8   248 ("Only disputes over facts that might affect the outcome of the suit under the governing law

9   will properly preclude the entry of summary judgment.").  Whether a factual dispute is material is

10  determined by the substantive law applicable for the claim in question.  *Id*.  If the opposing party

11  is unable to produce evidence sufficient to establish a required element of its claim that party fails

12  in opposing summary judgment.  "[A] complete failure of proof concerning an essential element

13  of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S.

14  at 322.

15         Second, the dispute must be genuine.  In determining whether a factual dispute is genuine

16  the court must again focus on which party bears the burden of proof on the factual issue in

17  question.  Where the party opposing summary judgment would bear the burden of proof at trial on

18  the factual issue in dispute, that party must produce evidence sufficient to support its factual

19  claim.  Conclusory allegations, unsupported by evidence are insufficient to defeat the motion.

20  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Rather, the opposing party must, by affidavit

21  or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue

22  for trial.  *Anderson*, 477 U.S. at 249; *Devereaux*, 263 F.3d at 1076.  More significantly, to

23  demonstrate a genuine factual dispute the evidence relied on by the opposing party must be such

24  that a fair-minded jury "could return a verdict for [him] on the evidence presented."  *Anderson*,

25  477 U.S. at 248, 252.  Absent any such evidence there simply is no reason for trial.

26         The court does not determine witness credibility.  It believes the opposing party's

27  evidence, and draws inferences most favorably for the opposing party.  *See id*. at 249, 255;

28  *Matsushita*, 475 U.S. at 587.  Inferences, however, are not drawn out of "thin air," and the

1   proponent must adduce evidence of a factual predicate from which to draw inferences. *American*

2   *Int'l Group, Inc. v. American Int'l Bank*, 926 F.2d 829, 836 (9th Cir. 1991) (Kozinski, J.,

3   dissenting) (citing *Celotex*, 477 U.S. at 322).  If reasonable minds could differ on material facts at

4   issue, summary judgment is inappropriate. *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th

5   Cir. 1995).  On the other hand, "[w]here the record taken as a whole could not lead a rational trier

6   of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475

7   U.S. at 587 (citation omitted); *Celotex*, 477 U.S. at 323 (if the evidence presented and any

8   reasonable inferences that might be drawn from it could not support a judgment in favor of the

9   opposing party, there is no genuine issue).  Thus, Rule 56 serves to screen cases lacking any

10   genuine dispute over an issue that is determinative of the outcome of the case.

11         B.      Discussion

12         Dev asserts two claims for relief.  The first is that the route adjustment and salary

13   reduction was motivated by discrimination on account of race, color, national origin, and sex in

14   violation of Title VII of the Civil Rights Act ("Title VII").  The second is that the route

15   adjustment and salary reduction was motivated by retaliation for his having engaged in protected

16   activity, in violation of Title VII.  "In order to evaluate claims of intentional discrimination where

17   intent itself is generally impossible to prove, courts apply a burden-shifting analysis. *See*

18   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Patterson v. McLean Credit*

19   *Union*, 491 U.S. 164, 186, (1989), superseded by statute on other grounds, Civil Rights Act of

20   1991, Pub.L. No. 102-166, 105 Stat. 1071." *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138,

21   144 (9th Cir. 2006).  To establish a prima facie case of disparate treatment under Title VII,

22   plaintiff must introduce evidence that "give[s] rise to an inference of unlawful discrimination."

23   *Yartzoff v. Thomas*, 809 F.2d 1371, 1374 (9th Cir. 1987) (quoting *Texas Dep't of Community*

24   *Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  A plaintiff may do so by demonstrating that (1) he

25   is a member of a protected class, (2) he was performing his job in a satisfactory manner, (3) he

26   suffered an adverse employment decision, and (4) he was treated differently than similarly

27   situated persons outside his protected class. *McDonnell Douglas Corp.*, 411 U.S. at 802.

28   /////

1    Similarly, a prima facie case for retaliation is dependent upon a threshold showing of facts

2    sufficient to give rise to an inference of unlawful retribution for having complained of

3    discrimination or otherwise engaged in activity protected by Title VII.  Thus, to establish a prima

4    facie case of retaliation, plaintiff must establish that "(1) he engaged in protected activity, (2) he

5    suffered an adverse personnel action, and (3) there was a causal link between the two." *Jordan v.*

6    *Clark*, 847 F.2d 1368, 1376 (9th Cir.1988); *Yartzoff*, 809 F.2d at 1375.

7    If plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a

8    legitimate, non-discriminatory (and, here, non-retaliatory ) reason for its decision.  *Manatt v.*

9    *Bank of Am., N.A*., 339 F.3d 792, 800 (9th Cir. 2003).  Once an employer does so, the plaintiff

10   bears the burden of proving that the articulated reason was merely a pretext for a discriminatory

11   motive.  *Id*.; *Costa v. Desert Palace, Inc*., 299 F.3d 838, 856 (9th Cir. 2002) (en banc) (citing

12   *Price Waterhouse v. Hopkins*, 490 U.S. 228, 260 (1989)).

13   Plaintiff can demonstrate pretext by "directly persuading the court that a discriminatory

14   [or retaliatory] reason more likely motivated the employer[,] or indirectly by showing that the

15   employer's proffered explanation is unworthy of credence." *Stegall v. Citadel Broad. Co*., 350

16   F.3d 1061, 1066 (9th Cir. 2003) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248,

17   256 (1981) (citation omitted)).  "'Direct evidence is evidence which, if believed, proves the fact

18   [of discriminatory or retaliatory animus] without inference or presumption.'" *Godwin v. Hunt*

19   *Wesson, Inc*., 150 F.3d 1217, 1221 (9th Cir. 1998) (quoting *Davis v. Chevron, U.S.A., Inc*., 14

20   F.3d 1082, 1085 (5th Cir. 1994)).  "When the plaintiff offers direct evidence of discriminatory

21   motive, a triable issue as to the actual motivation of the employer is created even if the evidence

22   is not substantial." *Godwin*, 150 F.3d at 1221.  In contrast, when direct evidence is unavailable,

23   and the plaintiff proffers only circumstantial evidence that the employer's motives were different

24   from its stated motives, plaintiff must show "specific" and "substantial" evidence of pretext to

25   survive summary judgment.  *Id*. at 1222.

26                    1.    Prima Facie Case

27   The starting point under the *McDonnell Douglas* and *Burdine* shifting burdens analysis is

28   whether plaintiff has produced sufficient evidence to establish a *prima facie* case.  The Ninth

1   Circuit has noted that "[a] plaintiff alleging employment discrimination 'need produce very little

2   evidence in order to overcome an employer's motion for summary judgment.  This is because the

3   ultimate question is one that can only be resolved through a searching inquiry--one that is most

4   appropriately conducted by a factfinder, upon a full record.'"  *Davis v. Team Elec. Co*., 520 F.3d

5   1080, 1089 (9th Cir. 2008) (internal citations omitted); *see also Peterson v. Hewlett-Packard Co*.,

6   358 F.3d 599, 603 (9th Cir. 2004) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co*., 840 F.2d

7   1409, 1419 (9th Cir. 1988)).

8          Plaintiff's effort to show a prima facie case is cluttered by several unhelpful arguments

9   that fail to focus on the required elements.  Nonetheless, he ultimately has met his burden at this

10   prong.  Plaintiff initially asserts several misdirected arguments concerning the procedures utilized

11   in conducting the March 24, 2012 route adjustments.  He argues that the Postal Service violated

12   the collective bargaining agreement by eliminating Route 16 and distributing its territory.  He

13   contends that under the Agreement, the Postal Service was required to post Route 16 for bids

14   within thirty days of it becoming vacant, which it allegedly failed to do.  ECF No. 37 at 5-8.  He

15   also contends that the Postal Service was required to post the highway contract route for bids, but

16   failed to do so.  *Id*. at 8.  He further argues that the Postal Service violated the Agreement by

17   leaving Route 1 vacant for approximately three years without posting it for bids.  *Id*. at 9.  Lastly,

18   plaintiff argues that the Postal Service failed to comply with various section of the collective

19   bargaining agreement by failing to provide plaintiff notice of the March 24, 2012 route

20   adjustments.  *Id*. at 16-17.  But plaintiff's arguments lose sight of the issue before the court—

21   whether plaintiff was treated differently or discriminated against because of his race, color, sex,

22   or national origin, or was subjected to retaliation for prior protected activity.  As was previously

23   explained to plaintiff in *Dev I*:

24              As a threshold matter, Dev's procedural arguments regarding his
                union grievances appear to lose sight of the issue of whether there
25              is any evidence that he was treated differently than similarly-
                situated employees.  He argues at length over whether Rural Route
26              8 was properly posted and filled in accordance with the
                Association's Agreement, and whether management has properly
27              interpreted that agreement. Fundamentally, however, the issue in
                this Title VII action is whether Dev was treated differently or
28              discriminated against because of his race, color, sex, or national

11

origin--not whether defendant was correct or even wise in its management decisions. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (Title VII "only require[s] that an employer honestly believed its reason for its actions, even if its reason is 'foolish or trivial or even baseless.'") (citing *Johnson v. Nordstrom, Inc*., 260 F.3d 727, 733-34 (7th Cir. 2001)).   Thus, whether the local Postmaster was correct in her decisions or her understanding of the union contract is not at issue here.

*Dev I*, ECF No. 139 at 30-31.

Likewise, the focus here is not whether management made procedural errors adjusting various routes, or whether the March 2012 adjustment complied with the collective bargaining agreement. *Villiarimo*, 281 F.3d at 1063; *Johnson*, 260 F.3d at 733-34.  The issue is whether the decision to do so was motivated by race or retaliation.

Turning to Dev's claims of discrimination and retaliation, the Postmaster argues that Dev cannot establish a *prima facie* case because he cannot demonstrate that the adjustment of his route from a 46H to a 43K route was an adverse employment action.  Defendant further argues that Dev cannot show that similarly-situated rural letter carriers outside of his protected class were treated more favorably than he, or that there was any causal link between Dev's prior protected activity and the granting of Dev's request for the route adjustment that resulted in the pay change.  ECF No. 27-1 at 16-19.

As defendant argues, "[n]ot every employment decision amounts to an adverse employment action." *Strother v. Southern California Permanente Medical Group*, 79 F.3d 859, 869 (9th Cir. 1996).  Rather, an employment action is adverse if it "'materially affects the compensation, terms, conditions, or privileges of employment.'" *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (quoting *Chuang v University of Cal. Davis, Bd. Of Trustees*, 225 F.3d 1115, 1126 (9th Cir. 2000)).   Defendant argues that there was no adverse employment action because Dev himself is responsible for his decrease in pay.  ECF No. 27-1 at 16-17. Defendant acknowledges that a reduction in pay would generally be considered an adverse employment action, but argues that the salary change resulted from plaintiff's request that additional territory be added to his route—a request that was granted—and therefore plaintiff should not be able to now claim that he suffered an adverse employment action.  *Id*.  The

1   argument conflates the plaintiff's minimal burden of showing a prima facie case with his ultimate

2   and higher burden of proof at the pretext stage of the analysis.

3        There is no dispute that Dev engaged in prior protected activity.  He filed a formal EEO

4   complaint of discrimination on September 27, 2010, alleging discrimination on the basis of race,

5   color, national origin, and gender.  Olsen Decl., Ex. D.  An EEOC Administrative Judge

6   thereafter issued a decision on August 29, 2011, granting summary judgment in favor of the

7   Postal Service.  *Id.*, Ex. E.  The Postal Service issued its Notice of Final Agency Action

8   implementing the Administrative Judge's decision on September 8, 2011.  *Id.*, Ex. F.  Plaintiff

9   filed a second formal complaint on March 11, 2011, alleging discrimination on account of race,

10  color, and sex.  *Id.*, Ex. G.  On August 17, 2011, the Postal Service issued a Final Agency

11  Decision, finding no discrimination.  *Id.*, Ex. H.  Dev subsequently filed an employment

12  discrimination action in this court on November 7, 2011, based on the events set forth in those

13  two EEO complaints.  See *Dev I*, 2:11-cv-2950.  It is also undisputed that a few months later, in

14  March 2012, plaintiff's salary was reduced by $5,808.

15       Granted, as defendant points out, there is also no dispute that plaintiff requested a route

16  adjustment.  But defendant's proffered explanation for why a route adjustment necessitated and

17  therefore explains the salary reduction (the focus of the next step in the analysis once prima facie

18  case is shown) is not part of the inquiry as to whether plaintiff initially presented the elements

19  necessary for a prima facie case.  Plaintiff's prima facie allegations do not include an assertion

20  that he specifically requested a change in pay.  Rather, that is a fact supplied by defendant's

21  explanation for the alleged adverse employment action.  Thus, while it is undisputed that plaintiff

22  requested a route adjustment; he has presented enough information to satisfy the elements for a

23  prima facie case.  In short, he has established that his salary was reduced after having engaged in

24  protected activity, and the proximity in time (*see Yartzoff*, 809 F.2d at 1376) warrants an

25  explanation from the employer; a point seemingly conceded by the defendant given his proffer of

26  such an explanation at this step.[8]

27

28       [8] Dev also points to several Caucasian and female carriers for routes 2, 9, 13, 15, 17 and
     19, whose route adjustments yielded what plaintiff deems to be more favorable treatment than his

2.    Legitimate, Non-Discriminatory Reason

Having concluded that Dev has met his initial, minimal burden of showing a prima facie case, the burden shifts to his employer to articulate a legitimate, non-discriminatory and non-retaliatory reason for why Dev's salary was reduced.  The defendant has explained that granting Dev's request for more territory, not discrimination or retaliation, caused the reduction in pay.

The Postmaster presents the declarations by the Rocklin Postmaster (Cheri Smith) and an Operations Program Support Specialist/District Rural Coordinator (Sandra Schmidt) to explain the salary structure and route adjustment process as they relate to Dev's claims here.  As noted by the court at oral argument, those declarations largely refute plaintiff's claim that similarly-situated non-protected employees were treated more favorably than plaintiff in the March 2012 route adjustments, but they did not satisfactorily explain the rural route pay structure and why the addition of more hours would yield the seemingly counterintuitive result of a reduction in salary.  As noted at the hearing, Dev's written request asked that substantial portions of other routes be moved to his route.  Without further explanation, one would reasonably infer from that request that Dev was requesting more territory because he wanted more, not less, pay.  Accordingly, the court ordered supplemental briefs and declarations as to the compensation system for rural route carriers, which have now been submitted by the parties.

As discussed above, the record shows that plaintiff had previously elected the high option of a "46H route," the result being that his salary was based on 46 evaluated hours and that he had no days off per pay period.[9]  ECF No. 44 at 6, ¶ 28.  By March of 2012, circumstances were changing and rural carriers had an opportunity to add territory if they wanted to do so.  The

---

route adjustment.  While the record is not clear that each of these other carriers were similarly situated to Dev, the court will assume a prima facie case as to Dev's allegation of disparate treatment given that the defendant must now explain the outcome in light of the retaliation claim.

[9]  Until electing the high option of 46H, the standard hours and minutes for Dev's route were evaluated at 45:32.  ECF No. 44 at 6, ¶ 26.  With 45:32 standard hours and minutes, Dev had the option to classify his route as a 42J route, a low option.  *Id.* ¶¶ 15, 27.  Under this low option, Dev's salary would have been based on 42 evaluated hours, but he would have received a relief day every other week.  *Id.* ¶¶ 15, 29.  Instead, plaintiff elected the high option of 46H and no days off per pay period.  *Id.* ¶ 28.

1    Rocklin Postmaster, Cheri Smith, explains that two events had made this possible.  Rural Route

2    16, which had been vacant, was being distributed to other existing routes.  Additionally, territory

3    from a highway contract route was being used to create a full-time rural route.  ECF No. 27-3 at

4    4, ¶ 17.  The Postmaster's main goals were to convert the contract route to a regular rural route

5    and to eliminate Rural Route 16 and free up territory "to build up Rural Routes 1, 3, 4, 7, 8, 9, 13,

6    15, 17, and 20, some of which had low evaluations and could handle more deliveries." *Id*. ¶ 19.

7    Postmaster Smith describes in her declaration the process by which she and her staff determined

8    how to achieve those goals and alter routes.  Significantly here, before making the March 2012

9    adjustments, she announced to carriers that if they wanted additional territory they must submit a

10   written request for it.  ECF No. 44 at 6, ¶ 30.  Dev responded and informed the Postmaster Smith

11   in writing that he wanted additional territory added to his route.  ECF No. 27-4 at 87; Dev Dep. at

12   39.  Dev was granted more territory and the standard hours and minutes for his route rose from

13   45:32 to 52:08.  ECF No. 44 at 7, ¶ 34.  Using the "Table of Evaluated Hours for Rural Carriers"

14   required by the Collective Bargaining Agreement (*id*. at 3-4, ¶ 15), plaintiff's adjusted route was

15   reclassified.  *Id*. at 7, ¶ 35.  The key to why Dev's salary dropped as a result of additional territory

16   is that his new standard hours and minutes, i.e. 52:08, falls within only one category—a K Route

17   with 43 evaluated hours.  *Id*.  This required plaintiff's route to change from an H Route with no

18   relief days per pay period to a K Route with two relief days.  Thus, with the reclassification Dev

19   gained two relief days every pay period, but his yearly salary necessarily dropped.

20          As shown from the Table, depending on how many evaluated hours are added to a route

21   by increasing its territory, adding territory can--and in this case did--require a change from a route

22   that has no relief days off but higher compensation to a route that has two relief days off but less

23   compensation.  Carriers contemplating such a choice must consider the trade-off of days off

24   versus a higher salary.  Each has value, but its relative worth to the employee is a matter of

25   lifestyle choice.  Apart from the obvious value in having an additional day(s) off every week,

26   Sandra Schmidt, the Operations Program Support Specialist and District Rural Coordinator, states

27   in her supplemental declaration that in her years of experience in coordinating rural route

28   adjustments for the post offices within the Sacramento District, which includes the Rocklin Post

1    Office, she has observed that the vast majority of rural carriers prefer a K route over an H route

2    because of the additional days off.  Supplemental Decl. of Sandra Schmidt ("Suppl. Schmidt

3    Decl."), ECF No. 39-2, ¶ 24.

4                                    3.    Pretext

5          The explanation provided by Dev's employer, while complicated by a difficult to follow

6    system under a union contract, articulates a legitimate, non-discriminatory and non-retaliatory

7    reason for the reduction in salary.  Thus, the defendant has met his burden at this stage of the

8    *McDonnell Douglas* analysis.  Therefore, Dev must now meet his ultimate burden of proving that

9    race and or/retaliation and not the articulated reason motivated the reduction in his salary.  *Manatt*

10   *v. Bank of Am., N.A.*, 339 F.3d at 800; *Costa v. Desert Palace, Inc.*, 299 F.3d at 856.  He may do

11   so either with direct evidence or by showing that the articulated reason is merely a pretext for a

12   discriminatory and/or retaliatory motive.  Dev has not produced any direct evidence of unlawful

13   discrimination, but instead relies on circumstantial evidence to establish pretext.[10]  Dev's burden

14   arises in the context of a motion for summary judgment.  To defeat summary judgment, it is his

15   burden to demonstrate that there is a genuine dispute over an issue of fact material to resolving

16   that question.  To establish a genuine factual dispute the evidence Dev relies on must be such that

17   a fair-minded jury "could return a verdict for [him] on the evidence presented."  *Anderson*, 477

18   U.S. at 248, 252.  Absent any such evidence there simply is no reason for trial.  *Celotex*, 477 U .S.

19   at 32.  Dev fails to meet that burden here.

20         While the resultant reduction in pay appears at cross-purposes for what Dev says he was

21   trying to achieve,[11] the very real possibility that granting his request could result in more days off

_____

22         [10] Where a plaintiff produces only circumstantial evidence that the employer's motive
23   differed from its stated motive, plaintiff must show "specific" and "substantial" evidence to
     survive summary judgment.  *Godwin*, 150 F.3d at 1222.  To meet this burden, plaintiff "cannot
24   simply show the employer's decision was wrong, mistaken or unwise."  *Dep't of Fair
     Employment & Housing v. Lucent Techs.*, 642 F.3d 728, 746 (9th Cir. 2011).  He "must
25   demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions
     in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could
26   rationally find them unworthy of credence."  *Id.*

27         [11] ECF No. 37 at 139, ¶ 74 (Dev states that he "asked to add territory from Route 16 and
     all the territory from Route 20 that was adjacent to Dev's route so that his evaluated hours are
28   increased; so that his weekly hours are increased; so that his salary is increased.").

but a corresponding reduction in salary was not unanticipated by him.  He conceded in his deposition testimony that he knew that if his standard hours went up it could cause his route to be reclassified as a K Route[12] and that the result could be that he would be paid less but given one or more days off.[13]   When pressed for why he would pursue the request given the chance that he could incur a reduction in pay, Dev's response only supports Postmaster Smith's explanation:

> Q: Okay.  I'm just trying t[o] understand why you would ask for more standard hours and minutes when there was a likelihood that you would actually make less money?
>
> A: If it will go fairly, Mr. Olsen, then I will get the extra day off.

Dev Dep. at 50.  Thus, rather than offer evidence, which if accepted as true, would prove that the Rocklin Postmaster's explanation for the salary reduction is unworthy of credence and pretextual, Dev's testimony supports Smith's explanation.  Given Dev's recognition that he might get the extra day off, it is perhaps not surprising that his letter to the Postmaster requesting more territory did not specify that he only wanted more territory if it would result in higher pay and not if it would result in a reclassification of his route to one having a relief day(s) but less pay.  ECF No. 27-4 at 87; Dev Dep. at 39.  Nor did Dev otherwise inform the Postmaster that his goal was more

---

[12] Q: "Did you know that if your standard hours and minutes went up as a result of the adjustments that your route would be a K route?"
    A: "Of course I did know."

Dev Dep. at 43.  When asked again he confirmed: "I did know that if the standard hours would change it would go to the K category, yes, I did know that."  *Id.*

[13] Q: ". . . you might get paid more that you made before the adjustments or you might get paid less than you did before the adjustments; is that correct?"
    A: "Yes,  At the time of adjustment.  After the adjustment, yeah, I can get a low salary or high salary.  I don't know in advance."

    ***
    Q: "But you knew that was a possibility before the adjustments.  When you asked for more territory, you knew that was a possibility."
    A: "Anything can happen, yes."

Dev Dep. at 44

pay and he did not want a route with any relief days.[14]  Implicit in Dev's request for the addition of substantial more territory is a request for more hours.  Yet Dev did not state in his request a desire to limit the amount of additional territory and resulting evaluated hours so that his route did not get reclassified to a K Route.  To the contrary, Dev's request stated that he should be given territory on Route 20 adjacent to his route because the carrier for Route 20 drives through Dev's route to reach that territory.  His request also stated that "[m]ost of the territory on Route 16 is right on my line of travel.  It is my request that territory from Rt 16 should be added to my route."  ECF No. 27-4.  One can only infer from those statements that Dev was asking for as much additional territory as possible.  The Rocklin Postmaster granted the request, and as a result Route 8 gained additional territory worth 6:36 weekly standard hours and minutes.  Schmidt Decl. ¶ 35.  Consequently, Route 8 was assessed as a 43K route, and Dev gained two relief days but his salary was reduced by $5,808.  Granting plaintiff additional territory pursuant to his request is a legitimate, non-discriminatory and non-retaliatory reason for the pay adjustment here.

While Dev is no doubt disappointed with the results of the route adjustment, there is no evidence presented that a reasonable fact finder could rely upon to conclude that those results were motivated by race or retaliation.  There is unrefuted evidence that many route carriers prefer a route classification that provides one or two relief days in a pay period.  In light of that, it is simply not reasonable to infer that granting a written request for additional territory that happened to yield such a result was done out of discriminatory or retaliatory animus.  There is no testimony by Dev that he conditioned his request for the adjustment only on his receiving a higher salary, or that he otherwise expressed to the Postmaster that he did not want a route change if it could lower his salary.  And most significantly, Dev knew that a reclassification to an H Route with less pay but two relief days was a distinct possibility but he made the request anyway.  Dev was in an H route evaluated at 46 hours.  Under the Tables, the maximum number of evaluated hours possible

---

[14] Q: "So did you say to Ms. Smith, 'Ms. Smith, I want more standard hours and minutes but not too many because then my – I will get paid less'?  Did you specify how may standard hours and minutes that you wanted?"

A:  "No."

Dev Dep. at 47 – 48.

1    for an H route is 46 hours.  *See* ECF No. 27-2 at 3.  Thus, when Dev made his request for more

2    territory he was at the highest number of hours and highest salary possible for an H route.

3    Indeed, under those tables, 46 hours is also the highest possible for a J route.  It thus was not at all

4    unforeseeable that insisting, as Dev did in his letter, that substantial more territory be added to his

5    route could very well result in a reclassification of his route to the only category, K routes, that

6    would accommodate greater than 46 evaluated hours.  But, as discussed, the K routes all have 2

7    relief days per period.

8         Dev also relies on a letter from Oscar Bosch, the carrier for Route 5, addressed to the

9    Rocklin Post Office, which requests that the Park Place town houses be added to his route.  ECF

10   No. 37 at 109 (Ex. 14); Smith Decl. ¶ 8.  It appears that no additional territory was added to Route

11   5, Schmidt Decl. ¶ 32, and Dev argues that this undermines the credibility of the Rocklin

12   Postmaster's explanation that Dev's route was changed because Dev asked for more territory.  To

13   the contrary, the example of Route 5 supports Postmaster Smith's explanation.  She states in her

14   declaration that her main goals were to convert a highway contract route and to eliminate Route

15   16 and use the territory to build up particular routes that she had specified as having low

16   evaluations and capable of handling more deliveries.  ECF No. 27-3 at 4 (¶¶ 17 & 19).  Route 5 is

17   not one of those specified routes.  *Id.*  Thus, adding territory to Route 5 would not have furthered

18   the goal of the Postmaster in making the route adjustments and declining Bosch's request in no

19   way contradicts the proffered explanation by Smith for the route changes.

20        In short, there is simply no evidence to prove that Smith has proffered a false explanation

21   for the salary change.

22        Dev also claims that there was disparate treatment on the basis of race and gender in how

23   territory was divided and hours rated during the March 2012 route adjustments.  He appears to

24   rely on this argument both as to a prima facie case as well as to refute the Postmaster's

25   explanation for the route reclassification and salary change.  But Dev bases his disparate

26   treatment argument on conclusory allegations.  He proffers no evidence that would allow a

27   reasonable jury to find that other similarly-situated rural letter carriers outside of his protected

28   class were treated more favorably than he.  A total of 11 rural routes were adjusted on March 24,

2012, including Routes 1, 2, 3, 4, 7, 8, 9, 13, 15, 17, 20.  Smith Decl. ¶ 28, Schmidt Decl. ¶ 32.

Prior to the adjustment, each route's standard hours and minutes and classification were as

follows:

Route 1 (relief carrier) 35H route with 34:53 standard hours and minutes. [15]

Route 2 (Caucasian, White, Female carrier) 41H route with 41:17 standard hours and minutes.
Route 3 (Asian, Brown, Male carrier) 42H route with 41:38 standard hours and minutes.
Route 4 (Hispanic, Brown, Male carrier) 43J route with 46:31 standard hours and minutes
Route 7 (Asian, Brown, Female carrier) 41H route with 40:59 standard hours and minutes.
Route 8 (plaintiff's route) 46H route with 45:32 standard hours and minutes.
Route 9 (Caucasian, White, Male carrier) 42H route with 42:08 standard hours and minutes.
Route 13 (Caucasian, White, Male carrier) 43J route with 47:16 standard hours and minutes.
Route 15 (Caucasian, White, Male carrier) 42H route with 42:26 standard hours and minutes.
Route 17 (Caucasian, White, Female carrier) 42J route with 46:09 standard hours and minutes.
Route 20 (Caucasian, White, Female carrier) 47K route with 55:49 standard hours and minutes.

Schmidt Decl. ¶ 32; Smith Decl. ¶ 8.

As a result of the March 24, 2012 adjustments, each route's classification and standard

hours and minutes were as follows:

Route 1 (relief carrier) 42K route with 50:30 standard hours and minutes
Route 2 (Caucasian, White, Female carrier) 48:13 and classified as a 40K route.
Route 3 (Asian, Brown, Male carrier) 42K with 50:18 standard hours and minutes.
Route 4 (Hispanic, Brown, Male carrier) 43J with 46:49 standard hours and minutes.
Route 7 (Asian, Brown, Female carrier) 43K with 51:26 standard hours and minutes.
Route 8 (plaintiff's route) 43K with 52:08 standard hours and minutes.
Route 9 (Caucasian, White, Male carrier) 42J route with 45:34 standard hours and minutes.
Route 13 (Caucasian, White, Male carrier) 43K with 51:26 standard hours and minutes.
Route 15 (Caucasian, White, Male carrier) 46K with 55:22 standard hours and minutes.
Route 17 (Caucasian, White, Female carrier) 43K route with 51:58 standard hours and minutes.
Route 20 (Caucasian, White, Female carrier) 45K route with 53:54 evaluated hours and minutes.

Schmidt Decl. ¶ 32; Smith Decl. ¶ 8.

Thus, plaintiff gained more standard hours and minutes than 2 female rural carriers, but

less standard hours and minutes than 2 female carriers.[16]  He also gained more standard hours and

minutes than 4 Caucasian, white carriers, but gained less standard hours and minutes than 2

---

[15]   Route 1 was vacant at the time of the March 2012 adjustments and was carried by a relief carrier.  Route 1 was assigned to Louise Dematos on April 21, 2012.  Smith Decl. ¶ 28.

[16] Plaintiff gained 6:36 standard hours and minutes.  Route 7 (Asian, Brown, Female carrier) gained 12:56 standard hours and minutes and Route 2 (Caucasian, White, Female) gained 6:56 standard hours and minutes.  Route 17 (Caucasian, White, Female) gained 5:49 standard hours and minutes, while Route 20 lost 1:55 standard hours and minutes.  Smith Decl. ¶ 28.

1    Caucasian, white carriers.[17]  As for the total number of standard hours and minutes for each route

2    after the March 2012 adjustments, plaintiff had more standard hours and minutes than 3 female

3    carriers and less standard hours and minutes than 1 female carrier.[18]  He also ended up with more

4    standard hours and minutes than 4 Caucasian, white carriers and less standard hours and minutes

5    than 2 Caucasian, white carriers.[19]  This evidence simply cannot support Dev's conclusory

6    assertion that he was treated differently than similarly-situated people outside his protected class.

7         In his opposition, Dev argues that every Caucasian, white, carrier was treated more

8    favorably and had their evaluated hours increased, while every Non-Caucasian, white, carrier

9    suffered loses.  ECF No. 37 at 25.  He contends that the evaluated hours were increased for Route

10   20, which was carried by a Caucasian, white, female, and that this led to a salary increase of more

11   than $1,600.  To support this contention, as well as his claim that all Caucasian carriers received

12   an increase in evaluated hours, Dev cites to his affidavit.  ECF No. 37 at 12-13; 133-141.

13   However, as observed by defendant, plaintiff does not provide any documentation for the route

14   evaluations he sets forth in his affidavit, nor does his affidavit provide a foundation for how he

15   has personal knowledge of each route's evaluation both before and after the adjustments.  *See*

16   Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to . . . oppose a motion must be made

17   on personal knowledge, set out facts that would be admissible in evidence, and show that the

18   affiant or declarant is competent to testify on matters stated."); *see also Rodriguez v. Airborne*

19   *Express*, 265 F.3d 890, 902 (9th Cir. 2001) ("This circuit has held that self-serving affidavits are

20   cognizable to establish a genuine issue of material fact so long as they state facts based on

21   personal knowledge and are not too conclusory.").  While plaintiff certainly has personal

22   _____

[17] Routes 2, 9, 13, 15, 17, 20 were all held by Caucasian, white carriers.  Plaintiff gained
23   6:56 standard hours and minutes, which was more than Routes 17 (gained 5:49), 13 (gained 4:36),
     9 (gained 3:26), and 20 (lost 1:55), but less than Routes 15 (gained 12:56) and 2 (gained 6:56).
24

25   [18] Routes 2, 7, 17, and 20 were all held by female carriers.  Plaintiff's route, with 52:08
     standard hours and minutes, had more standard hours and minutes than Routes 2 (48:13), 7
26   (51:26), and 17 (51:58), but less than Route 20 (53:54).

27   [19] Plaintiff's route was assessed at 52:08 standard hours and minutes, which was more
     than the standard hours and minutes for Routes 17 (51:58), 13 (51:52), but less than the standard
28   hours and minutes for Routes 15 (52:22) and 20 (53:54).

1   knowledge of the evaluation for his route, he does not demonstrate that he has personal

2   knowledge of the evaluations for the other rural routes.  Nor is there any foundation for Dev's

3   knowledge of the circumstances of each of the other carriers whose routes were adjusted.[20]  Thus,

4   Dev's affidavit does not establish a genuine dispute over the standard hours and minutes and

5   evaluated hours for each route both before and after the March 2012 adjustments.

6       In an attempt to cure this deficiency, Dev submitted various exhibits with his

7   supplemental brief which he contends support his position that the route evaluations set forth in

8   the declaration of Sandra Schmidt are incorrect.  First, Dev submits a Brief of Rural Route

9   Changes-Proposed Changes.  ECF No. 47 at 16 (Ex. 2).  While this document does show different

10  evaluated hours for some of the routes, as is clear from the title, this document provides *proposed*

11  charges for the March 2012 adjustment.  Indeed, the table contained within the document only

12  purports to provide proposed standard hours and minutes and proposed route classifications.  *See*

13  *id*. at 16.

14      Dev also submits Route Interim Adjustment Worksheets prepared by Jamie Flanagan.

15  However, in her declaration, Ms. Flanagan testified that "[a]ll the work I do on adjustments is

16  preliminary and submitted to the district office for approval and finalization.  Evaluation times

17  and the number of deliveries can change."  ECF No. 39-3, Flanagan Decl., ¶ 9.  Ms. Schmidt also

18  explains in her supplemental declaration that

19          [A] Post Office engaging in route adjustments is responsible for
            delivering to me their adjustment package, which includes their
20          proposed route adjustments (changes in standard hours and minutes
            and evaluated hours) for each route.  I review the adjustment
21          package and make any necessary changes.  It is not unusual for the
            Post Office's proposed route adjustments to differ from the final
22          route adjustment that I work on.  In this case, the proposed route
            adjustment evaluations submitted by the Rocklin Post Office
23          Postmaster, with the assistance of Jamie Flanagan, differed slightly
            from the final route evaluations.
24
25  ECF No. 39-2 at 3, ¶ 6.  Thus, these exhibits only demonstrate that the adjustment package

26  submitted by the local Postmaster differed from the final evaluations.

27      [20] Although Dev seems to assume that all the other carriers had the same or similar
    circumstances, route classifications, evaluated hours and motivation as Dev (obtaining more pay
28  rather than time off) in seeking route adjustments, there is simply no evidence to support that.

22

1    Lastly, Dev provides several 4241-A forms.  ECF No. 47 at 25-31 (Ex. 6).  He contends

2    that these forms contain the "valid evaluation hours for each route."  *Id*. at 6.  Each form includes

3    a route evaluation that is effective October 20, 2012.  However, the forms also indicate that a mail

4    count occurred in September 2012.  Accordingly, this evidence does not reflect each route's

5    evaluation information regarding the March 24, 2012 adjustments.  It reflects each route's

6    evaluation after the September 2012 mail count.  Accordingly, Dev has not provided any

7    evidence refuting the route evaluations provided in Ms. Schmidt's declaration.

8    Ms. Schmidt's declaration demonstrates that as far as the number of standard hours and

9    minutes received, as well as the resulting total amount of standard hours and minutes, plaintiff

10    was not treated differently than similarly situated persons outside his protected class.

11    V.    Conclusion

12    For the reasons stated above defendant's motion for summary judgment must be granted.

13    Accordingly, it is hereby ORDERED that:

14    1.  Plaintiff's motion to strike the declaration of Sandra Schmidt is denied; and

15    2.  The Clerk is directed to file the September 6, 2013 deposition of plaintiff lodged on

16    December 19, 2013.

17    Further, it is RECOMMENDED that:

18    1.  Defendant's motion for summary judgment, ECF No. 27, be granted;

19    2.  Judgment be entered in defendant's favor; and

20    3.  The Clerk be directed to close the case.

21    These findings and recommendations are submitted to the United States District Judge

22    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

23    after being served with these findings and recommendations, any party may file written

24    objections with the court and serve a copy on all parties.  Such a document should be captioned

25    "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

26    /////

27    /////

28    /////

23

within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED:  September 25, 2014.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

24